Brian J. Panish, State Bar No. 116060
  *panish@psblaw.com*
PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard
Los Angeles, CA 90025
(310) 477-1700

Scott P. Schlesinger (*pro hac vice* pending)
  *scott@schlesingerlaw.com*
Jonathan R. Gdanski (*pro hac vice* pending)
  *jgdanski@schlesingerlaw.com*
Jeffrey L. Haberman (*pro hac vice* pending)
  *jhaberman@schlesingerlaw.com*
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33317
(954) 467-8800

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRYSTAL RAMIREZ-MURILLO, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JUUL LABS, INC., a corporation; ALTRIA GROUP, INC., a corporation; PHILIP MORRIS USA, INC., a corporation; ADAM BOWEN, an individual; JAMES MONSEES, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Krystal Ramirez-Murrillo, by and through her undersigned counsel, bring this Complaint against JUUL Labs, Inc., Altria Group, Inc., Philip Morris USA, Inc., Adam Bowen, James Monsees, and Does 1-100 and allege as follows:

## PARTIES

1.     Plaintiff Krystal Ramirez-Murillo is a citizen of Illinois, residing in Cook

---

County, Illinois.

2.     Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation. Its principal place of business is in San Francisco, California. JUUL's Registered Agent is InCorp Services, Inc., 5716 Corsa Ave, Ste. 110, Westlake Village, CA 91362-7354.

3.     Defendant Altria Group, Inc. ("Altria") is a Virginia corporation. Its principal place of business is in Richmond, Virginia.

4.     Defendant Philip Morris USA, Inc. ("Philip Morris") is a wholly-owned subsidiary of Altria. Philip Morris is a Virginia corporation. Its principal place of business is in Richmond, Virginia.

5.     Altria and Philip Morris are referred to collectively as the Altria Defendants. Altria acquired a 35% ownership stake in JUUL in order to sell, promote, market, and distribute JUUL's products. JUUL now has the Altria Defendants' industry infrastructure.

6.     Defendant Adam Bowen is a citizen of California, residing in San Mateo, California. Adam Bowen co-founded JUUL's predecessor, PAX Labs, Inc., which rebranded to JUUL in 2017. Adam Bowen was instrumental in developing JUUL's products, brand, and its youth-focused marketing strategy. He promoted JUUL's products as "carefully engineered […] for nicotine delivery and addiction." Adam Bowen also promoted JUUL's products as "fun," "rewarding," and "enjoyable."

7.     Defendant James Monsees is a citizen of California, residing in San Francisco, California. James Monsees co-founded PAX Labs, Inc. in 2007 with Defendant Adam Bowen. James Monsees promoted JUUL's products as "carefully engineered […] for nicotine delivery and addiction." James Monsees also promoted JUUL's products as "fun," "rewarding," and "enjoyable."

3.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 100 and therefore sue these Defendants by such fictitious names pursuant to the provisions of California Code of Civil Procedure § 474. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the

1    Defendants designated as a Doe are legally responsible in some manner for the events
2    and happenings hereinafter referred to, and caused damages thereby as hereinafter
3    alleged.  Plaintiff will seek leave of the Court to amend this complaint to show the true
4    names and capacities of the Defendants, and each of them, designated as Does when the
5    same have been ascertained. At all times relevant to this action Defendants and Does 1
6    through 100, inclusive, and each of them, were the agents, servants, employees and
7    joint venturers of each other and at all times herein mentioned each and all were acting
8    within the course, scope and purpose of their respective agency, service, employment
9    and joint venture relationships.

10                          **JURISDICTION AND VENUE**

11       4.      Defendants at all material times hereto were in the business of
12   manufacturing, designing, testing, assembling, supplying, selling, importing, and
13   distributing the JUUL e-cigarette device and JUULpods that are the subject of this
14   lawsuit.

15       5.      Plaintiff brings this complaint under federal diversity jurisdiction pursuant
16   to 28 U.S.C. 1332. There is complete diversity between all parties. The amount in
17   controversy exceeds $75,000.

18       6.      Venue is proper in this Court because JUUL's principal place of business is
19   in San Francisco, California; and much of the wrongful conduct occurred in the City
20   and County of San Francisco. Defendants James Monsees and Adam Bowen also work
21   and reside within the greater San Francisco, California region.

22                              **ALLEGATIONS**

23       6.      This case arises from Defendants failure to properly assess and warn about
24   the harm that its products cause to the human lungs and body. JUUL failed to evaluate
25   and warn about the dangers of its products, and it falsely markets and falsely advertises
26   its e-cigarette system as a safe alternative to traditional cigarettes. JUUL evaluated and
27   knew or should have known the potential dangers of its products but failed to
28   adequately ascertain and warn about those dangers. Plaintiff seeks relief for herself

individually.

7.    JUUL is a pioneer in Electronic Nicotine Delivery Systems ("ENDS") and related technologies. ENDS typically are touted as a safe alternative to traditional combustible cigarettes.  JUUL introduced its ENDS-branded, innovative commercial product to the United States market in 2015. JUUL products are available via retail locations in 150 countries and the JUUL online store.

8.    The JUUL system is comprised of two components: (i) a vaporizer device and (ii) disposable pods that are prefilled with a proprietary mixture of vaporizer carriers, nicotine salt extracts, and flavoring (together, "e-liquid"). When a user inserts a pod into the device and inhales using the mouthpiece, the device rapidly heats the e-liquid, aerosolizing it to allow the user to inhale a puff of the vaporized e-liquid. The labels for both the JUUL e-cigarette and pods contain California Proposition 65 warnings that the product contains a substance known to cause cancer. Yet the labels contain no warnings about the potential dangers of using JUUL products, including long-term effects of vaping and inhaling nicotine salts and flavored chemicals on the pulmonary, neurological, and cardiovascular systems. JUUL Labs, Inc., owns and operates juullabs.com and juulvapor.com where it markets, advertises, and sells e-cigarettes and pods.

9.    JUUL markets and advertises its e-cigarettes and pods deliberately to attract minors and young adults, including those who have never even been regular tobacco smokers. The JUUL system delivers more potent doses of nicotine than traditional cigarettes. Under the guise of a safe alternative, JUUL thus exposes these nonregular-tobacco users to highly-addictive products. The flavored product coupled with the patented nicotine formation creates a perfect storm for addiction among high schoolers, college students, and adults. The JUUL e-cigarettes and pods are available for purchase online. There is also a subscription service on JUUL's website. The JUUL system has been widely adopted and attained tremendous commercial success, currently holding over 70% of the e-cigarette market share. JUUL e-cigarettes are sleek, discrete,

and easy to hide. The system looks like a USB flash drive and can even be charged using the USB port of a computer. On its face, JUUL does not appear to be a tobacco-related product. Pods come in flavors that appeal to high-school and college students, including mango, fruit medley, crème brûlée, cool mint, and cool cucumber. Flavors play a key role in the use of tobacco products in teens and young adults. Numerous physician and health organizations have urged the FDA to act on this epidemic, citing the FDA's Population Assessment of Tobacco and Health (PATH) Study found that 85 percent of current e-cigarette users aged 12-17 had used flavored product in the past month and 81.5 percent of those young users cited flavors as the reason for their use of the product. JUUL e-cigarettes deliver nicotine more quickly, more effectively, and at higher doses than other e-cigarettes, increasing the users' risk of addiction. Each pod of e-liquid contains as much nicotine as a pack of cigarettes (i.e., about 200 puffs).

10.     E-cigarettes were largely unregulated until May 10, 2016, when the Department of Health and Human Services, Food and Drug Administration, passed 21 CFR Parts 1100, 1140, and 1143: "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statement for Tobacco Products". The FDA has allowed e-cigarettes that were already on the market as of August 8, 2016, to stay on the market until at least 2022 without filing applications or undergoing public health review by the FDA. The sale and market growth of JUUL e-cigarettes and pods has thus occurred without any regulatory oversight into the health risks of the vaporization of nicotine salts. On April 24, 2018, however, the FDA requested that JUUL submit to the FDA documents relating to market practices and research on marketing, effect of product design, public health impact, and adverse experiences and complaints related to JUUL products.

11.     The simple yet almost unfathomable reality is that, until recently, very little was known about the detrimental health effects that JUUL e-cigarettes and pods

cause to the human lungs and body. In accordance with section 904(b) of the FD&C Act, the FDA requested that JUUL "submit all documents relating to marketing practices and research activities and research findings, conducted, supported, or possessed by you or your agents relating to a specific set of topics...research may include, but is not limited to, focus groups, surveys, experimental clinical studies, toxicological and biochemical assays, in vivo and in vitro assays including animal testing, laboratory formulation and processing testing, taste panels, and assessments of the effectiveness of product marketing practices". Modern science has thus been playing catch-up with the effects of e-cigarettes on humans. Since the science has developed, we have found that JUUL is a wolf-in-sheep's-clothing, delivering as much or more nicotine and harmful chemicals as bigger, more conspicuous e-cigarettes. What has been marketed and sold as a fun, harmless, and trendy pastime is anything but that. This year the American vaporizer market will grow to five and a half billion dollars, an increase of twenty-five percent from 2017. 70% of that market belongs to JUUL.

12. Nicotine is both a stimulant and relaxant. Biochemically, it works by binding to receptors in multiple regions of the brain. It raises dopamine levels and can mimic key neurotransmitters that affect focus and arousal. The nicotine delivery for JUUL is enhanced by adding benzoic acid to nicotine salts, which occur naturally in tobacco, allowing for rapid nicotine delivery in vapor form that is quickly absorbed into the lungs and brain. When inhaled, the flavored vapor is pleasing to the palate and the nicotine produces a rush to the brain.

13. Dr. Johnathan Winickoff, the former chair of the American Academy of Pediatrics Tobacco Consortium, in March 2018 said that "JUUL is already a massive public-health disaster-and without dramatic action it's going to get much, much worse." Dr. Winickoff, who is also a pediatrician at Massachusetts General Hospital and Professor at Harvard Medical School also noted that: "[i]f you were to design your ideal nicotine-delivery device to addict a large numbers of United States kids, you'd invent JUUL". Of the emerging e-cigs, JUULs have all the necessary elements to take over a

substantial portion of the market share. Its batteries can be recharged in an hour, it is flavored, it can often be used without detection, and it contains somewhere around twice the concentration of nicotine as other vape products. For those aged 18 to 24, 40 percent were not smokers before using the device. On September 1, 2018, the Israeli Government instituted a ban on the sale of JUUL e-cigarettes in Israel, citing that JUUL poses "a grave danger to public health".

14.    JUUL's e-liquid contains five ingredients: glycerol, propylene glycol, nicotine, benzoic acid, and food-grade flavoring. Glycerol is a sweet liquid that has been used in antifreeze and toothpaste. Propylene glycol is used in asthma nebulizers. Benzoic acid is a common food preservative. Vaporing these liquids at elevated temperatures may result in the generation of known pulmonary toxicants, including acrolein, acetaldehyde, and formaldehyde. Some of the chemicals in the flavoring have known adverse respiratory effects. Marketed as a transitional product to help adult smokers stop smoking cigarettes, many physicians question whether the higher doses of nicotine delivered in a JUUL-vape draw just makes the user want more. Nicotine affects young peoples' cognitive development, making them more susceptible to other addictions later in life. A Lancet study in March 2007 ranked nicotine as more addictive than alcohol or barbiturates. The National Academies recently published Public Health Consequences of E-Cigarettes, which shows incontrovertible evidence that using e-cigarettes creates dependence.

15.    JUUL is patent-protected and has an expanding customer base. It has seen exponential growth that has far exceeded expectations. The company's patented JUULSalts approach to nicotine delivery is due to compounds called nicotine salts, which develop in heat-dried tobacco leaves. According to JUUL's website, freebase nicotine is mixed with benzoic acid to make the e-liquid, which has a chemical reaction that produces the nicotine salts. JUUL U.S. Patent No. 9,215,895 covers its process to produce nicotine salts. The patented process allows 20% more nicotine to enter the blood stream than a Pall Mall cigarette, rendering the risk of addiction and abuse higher

1   for JUUL users versus those who use traditional cigarettes.

2        16.    JUUL heavily promotes its products via social-media platforms. It presents

3   the products as trendy, fresh, and safer alternatives to cigarettes, thus minimizing the

4   health risks and addictiveness of "juuling". This marketing mirrors how the tobacco

5   industry promoted cigarettes as being cool while suppressing the long-term adverse

6   health complications.

7        17.    It took time and resources for healthcare researchers and clinicians to

8   research the effects of vaping on the lungs and human body. The evidence now shown

9   by numerous clinical and scientific studies is not favorable for JUUL. Stanton Glanz,

10   Professor of Medicine with the University of California, San Francisco Center for

11   Tobacco Control, Research and Education, said "it's important to understand that e-cigs

12   have an entirely different toxicological profile" than cigarettes. Glanz notes that "[t]he

13   assumption has been that at least e-cigarettes aren't worse. But this suggests that they

14   have something in them that isn't even in standard cigarettes that's worth being worried

15   about".

16        18.    Recent studies examining the effects of e-cigarettes on the lungs show

17   some of the dangers of vaping. A study form the Marsico Lung Institute and the

18   Department of Pathology at the University of North Carolina-Chapel Hill shows that

19   vaping from e-cigarettes causes a unique innate immune response in the lung, involving

20   increased neutrophilic activation and altered mucin secretion. The authors wrote "taken

21   together, our results indicate that the effects of e-cigarettes are both overlapping with

22   and distinct from what is observed in otherwise healthy cigarette smokers. In

23   conclusion, our results challenge the concept that e-cigarettes are a healthier alternative

24   to cigarettes and reverse smoking-induced adverse health effects." Reidel et al, E-

25   Cigarette Use Causes a Unique Innate Immune Response in the Lung, Involving

26   Increased Neutrophilic Activation and Altered Mucin Secretion, AM J RESPIR CRIT

27   CARE MED (2018 Feb 15;197(4):492-501). Another study by Dr. Casey G.

28   Sommerfield MD with the Children's Hospital of Pittsburgh of UPMC reported the first

case of hypersensitivity pneumonitis and acute respiratory distress syndrome as a risk of e-cigarette use in an adolescent. Dr. Sommerfield's case report involves an 18-year-old woman who presented with severe inflammatory disease of the lung called hypersensitivity pneumonitis. In an acute setting, hypersensitivity pneumonitis may be secondary to chemical exposure, which is found in e-cigarette vapor. The case report thus shows a life-threatening risk of e-cigarette use in an adolescent patient. Another study from the Comprehensive Cancer Center at the Ohio State University found that the induction of inflammation by e-cigs may differentially impact lung cancer and chronic obstructive pulmonary disease (COPD) risks and that the role of nicotine also needs to be considered, as it had both pro-and-anti-inflammatory potential, making it unclear how nicotine content may mediate the effects of the other aerosol constituents. Shields et al, A Review of Pulmonary Toxicity of Electronic Cigarettes in the Context of Smoking: A focus on Inflammation, CANCER EPIDEMIOL BIOMARKERS PREV 2017 Aug;26(8):1175-1191. Studies conducted at Tulane University show that e-cigarette aerosol is capable of inducing reactive oxygen species, DNA damage, and cell death in human umbilical vein endothelial cells" and that "in vivo studies of e-cigarette aerosol's effect on the cardiovascular system have shown broad spectrum of potentially negative effects. Anderson et al, E-Cigarette Aerosol Exposure Induces Reactive Oxygen Species, DNA Damage, and Cell Death in Vascular Endothelial Cells, TOXICOLOGICAL SCIENCES 154(2), 2016 332-340. Researchers at the West Virginia University School of Medicine published an animal study showing that the cardiovascular effects of long-term vaping may be as dire as smoking cigarettes. Results indicate that chronic exposure to e-cigarette vapor stiffened the aorta 2.5 times more than the regular aging process did in a vapor or smoke-free environment. In comparison, cigarette smoke caused a 2.8-fold increase. Olfert et al, Chronic exposure to electronic cigarettes results in impaired cardiovascular function in mice, J APPLIED PHYSIOL, 2018 Mar 1;124(3):573-582.

       19.     The regular use of e-cigarettes, including JUUL, presents a clear and

present danger of acute and chronic injury to the pulmonary and cardiovascular systems of nonsmokers and adults who were not consistent traditional cigarette smokers. Science News reports that about 1.9 million American adults who have never consistently smoked traditional cigarettes use e-cigarettes. About 60% of these users were between the ages of 18 and 24. These numbers were based on the analysis of data from 2016 and are much higher in 2018. We know that there are carcinogens in the vapor created by JUUL e-cigarettes and scientists are concerned about the addictive risk of nicotine and multiple chemicals that are contained in the vapor and how nicotine may serve as a catalyst to increase the risk of cancer. There is concern about the addictive properties of the JUUL e-cigarette in both nicotine addiction and behavioral aspects of juuling.

20.    JUUL has been incredibly successful through its marketing and branding, inducing youngsters, college students, and high-school students to start vaping. It has done so with wholly inadequate warnings about the potential health hazards of using the JUUL e-cigarettes and pods. Medical evidence shows significant health issues relating to the transmission of glycerol, propylene glycol, nicotine, benzoic acid, and food-grade flavoring in the vapor itself. The cytotoxic properties of these vaporized chemicals cause cellular damage to pulmonary and vascular cells that is acute and may lead to hypersensitivity pneumonitis and restrictive airway disease. There is growing scientific concern among public-health officials that vaping may cause a much higher rate of COPD in young adults and that vaping may evolve into a national health epidemic because it has become a means to nicotine addiction, rather than an end. Vaping among young people is surpassing all other forms of tobacco use.

21.    There is a subset of adults who use JUUL e-cigarettes and who will develop significant acute pulmonary inflammation, leading to pneumonitis and pneumonia that will require medical intervention, including hospitalization and potentially mechanical ventilation. There is another subset of JUUL users who will sustain varying degrees of pulmonary injury that, over time, may cause shortness of

breath, dyspnea, restrictive airway disease, and COPD. Modern pulmonary medicine allows physicians to assess and measure the level of pulmonary injury regarding both restrictive airway disease and inflammatory changes through advanced non-invasive pulmonary function tests and bronchoscopy. Past and current JUUL users who have exposed and continue to expose their pulmonary and cardiovascular systems to vapor will need medical monitoring to assess how badly the vaping has affected them. Restrictive airway disease is often permanent and JUUL users will need to know how continued use may permanently impair their health and restrict their mobility. The evidence shows that never smokers who use JUUL will have increased risks of cancer from the carcinogenic compounds found in the vapor.

22.     The FDA Commissioner has also recently announced a possible link between seizure and e-cigarette use.  See U.S. Food and Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's ongoing scientific investigation of potential safety issue related to seizures reported following e-cigarette use, particularly in youth and young adults; April 3, 2019, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

1.     Altria's public stance on e-cigarettes markedly differed from its private undertakings with respect to JUUL.

2.     The Altria Defendants closely and carefully monitored the details of JUUL's business for years prior to its decision to buy into JUUL in December 2018.  In an earnings call of December 2018, Altria Defendants stated that they had been in talks with JUUL's managers for "quite some time."  Altria's chief executive, Howard Willard, stated: "we've been monitoring [JUUL's] growth…for three years" – in other words, since JUUL launched back in 2015.

3.     Altria's disclosures to the Securities and Exchange Commission reveal it had been "closely" following JUULs journey to "see if it had staying power."

4.      Weeks after Altria announced it would remove its e-vapor products from the market to address the youth vaping epidemic, on December 20, 2018, Altria made public that it closed a $12.8 billion investment with JUUL, the leader in e-cigarettes, amounting to a 35% stake.  Thus, Altria is continuing to sell flavored e-cigarettes, which it told the FDA it would stop.

5.      Altria agreed to a non-competition obligation with JUUL as long as Altria is providing services to JUUL, which Altria has committed to doing for at least six years.

6.      Altria and JUUL also entered into a services agreement. Among other things, Altria will provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping prevention, cigarette pack inserts and inserts, regulatory matters and government affairs. Altria has also agreed to grant JUUL a non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field, subject to the terms and conditions set forth in an intellectual property license agreement between the parties.

7.      Pursuant to the agreement Altria has agreed to provide JUUL with certain commercial services on a cost-plus-3% basis for an initial term of six years.

8.      Pursuant to the agreement Altria will provide JUUL access to its prime retail shelf space, which will allow JUUL products to appear alongside Philip Morris combustible cigarettes like Marlboro, the country's most popular cigarette brand. Altria will also provide JUUL, through the Altria Group Distribution Company, sales and distribution services and thus: access to Altria's near 230,000 retail locations.

/ / /

/ / /

/ / /

/ / /

/ / /

9.     Pursuant to the agreement, Philip Morris, which maintains a database of cigarette smokers' mailing and email addresses, will send JUUL advertising and marketing messages to its customers.

10.    Further, pursuant to the agreement JUUL will benefit from Altria's influence with legislators and regulators and the expertise of Altria's legal team in countering tobacco litigation.

11.    At a conference call on December 20, 2018, Altria's CEO remarked that Altria felt "fortunate to be the tobacco company that's partnered up with JUUL" and that Altria would provide its infrastructure to JUUL in order to accelerate JUUL's growth.   During that call, Altria said it would continue to market conventional cigarettes "vigorously."

12.    According to Robert K. Jackler, MD, Principal Investigator of the Stanford Research into the Impact of Tobacco Advertising: "The joining of JUUL and Marlboro brings together the two dominant players in the teenage nicotine addiction market (e-cigarette & cigarette).   This powerful combination constitutes a clear and present danger to the youth of America as well as those around the world."

13.    Studies demonstrate that e-cigarette use is associated with increased risk for cigarette initiation and use, particularly among low-risk youths. See Berry KM, Fetterman JL, Benjamin EJ, et al. Association of Electronic Cigarette Use With Subsequent Initiation of Tobacco Cigarettes in US Youths. *JAMA Netw Open.* 2019;2(2):e187794. doi:10.1001/jamanetworkopen.2018.7794.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

14. Recent promotional practices of both companies suggest that they may pursue a strategy by which youth start with JUUL and graduate to Marlboro:

 

15.

 

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
























Original JUUL Design          Recent JUUL Design

COMPLAINT AND DEMAND FOR JURY TRIAL



23.     Plaintiff, as a young adult, began using JUUL and has sustained serious injuries from their JUUL usage, including but not limited to nicotine addiction.

24.     Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that their products were associated with or could cause serious injuries as well as their knowledge that they had failed to fully test or study said risks.

25.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study their product(s) for serious health risks further rendered warnings for this product inadequate.

26.     By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer severe personal injuries, including medical expenses, physical pain and mental anguish, diminished enjoyment of life, and loss of earnings, among other damages.

## **FIRST CAUSE OF ACTION: NEGLIGENCE**
## **(AGAINST ALL DEFENDANTS)**

27.     Plaintiff repeats, reiterates and realleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

28.     Defendants as designers, manufacturers, retailers, wholesalers, suppliers, and distributors of JUUL e-cigarettes and pods were negligent in carrying out the manufacturing, retailing, design, wholesaling, testing, advertising, promotion, and distribution of the products. Defendants' negligence proximately caused the defects inherent in the JUUL e-cigarettes and pods. Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

29.     As a proximate cause of Defendants' negligence, Plaintiff must employ clinicians to examine, treat, and care for them, and will incur medical, hospital, pharmaceutical, and incidental and consequential expenses.  Plaintiff will continue to incur such medical, hospital, pharmaceutical, and incidental and consequential expenses in the future.

## SECOND CAUSE OF ACTION: STRICT LIABILITY
## (AGAINST ALL DEFENDANTS)

30.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

31.     Defendants as the designers, manufacturers, retailers, wholesalers, suppliers, and distributors of the JUUL e-cigarettes and pods are strictly liable to the Plaintiff for designing, manufacturing, retailing, distributing, wholesaling, supplying, and placing on the market and in the flow of commerce a defective product knowing that the product would be used without adequate research, inspection, testing, and warning. The JUUL e-cigarettes and pods were not fit for their intended purpose and/or the risks inherent in the design of the JUUL e-cigarettes and pods outweighed the benefits and/or the JUUL e-cigarettes and pods were more dangerous than the Plaintiff anticipated. Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

**THIRD CAUSE OF ACTION: FAILURE TO WARN**

**(AGAINST ALL DEFENDANTS)**

32.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

33.     At the time the JUUL e-cigarettes and pods were supplied to Plaintiff, the product was defective as a result of Defendants' failure to adequately test for safety, and to give adequate warnings or instructions regarding the possibility of adverse health consequences, including to the lungs, brain, and cardiovascular systems, the development of medical problems associated with the use as described herein, including cancer, and other dangers that might be associated with use, such as possible seizures. Defendants also failed to inform and warn the Plaintiff that they had failed to perform adequate testing of the JUUL e-cigarettes and pods to ensure safety, including long-term testing of the product, testing for injury to the lungs, brain, and cardiovascular systems, and other related medical conditions.

34.     Defendants failed to both adequately test JUUL e-cigarettes and pods before marketing it available to consumers such as the Plaintiff and failed to disclose to Plaintiff that such testing had not been done and which testing would have disclosed the magnitude of the potential risks associated with the use of the JUUL e-cigarettes and pods. In the alternative, Defendants conducted adequate testing but failed to warn about the dangers of using JUUL e-cigarettes and pods.

35.     Defendants' failure to warn was willful and malicious in that the conduct was carried on with a conscious disregard for the safety and the rights of the Plaintiff. Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

36.     As a proximate cause of Defendants' actions, Plaintiff must employ clinicians to examine, treat, and care for them, and will incur medical, hospital, pharmaceutical, and incidental and consequential expenses. Plaintiff will continue to

1  incur such medical, hospital, pharmaceutical, and incidental and consequential expenses
2  in the future.

3  **FOURTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION**
4  **(AGAINST ALL DEFENDANTS)**

5      37.    Plaintiff repeats, reiterates and realleges each and every allegation of this
6  Complaint contained in each of the foregoing paragraphs inclusive, with the same force
7  and effect as if more fully set forth herein.

8      38.    During the period of time that Defendants designed, manufactured,
9  distributed, advertised, promoted, supplied, and marketed the JUUL e-cigarettes and
10  pods, Defendants falsely and negligently represented to the Plaintiff, the consumer of
11  the product, and the FDA that the JUUL e-cigarettes and pods were safe for use, safer
12  than traditional cigarettes, not harmful like traditional cigarettes, and were fit for their
13  intended purposes; that JUUL e-cigarettes and pods were not dangerous and did not
14  impose any health risks; and that the products would function without defect.

15      39.    The representations made by Defendants were false. Defendants
16  concealed, falsified, or misrepresented to the public, the FDA, and to medical providers
17  the true facts, representing that the JUUL e-cigarettes and pods are safe for use, safer
18  than traditional cigarettes, not harmful like traditional cigarettes, and fit for their
19  intended purposes, even though use of the JUUL e-cigarettes and pods may cause
20  severe medical problems as described herein.

21      40.    When Defendants made these representations, they knew or should have
22  known that the representations were false and that they were made with no reasonable
23  ground for believing them to be true. The representations were made by Defendants
24  with intent to deceive users of the JUUL e-cigarettes and pods, the FDA, and the
25  public, with intent to induce them to use JUUL e-cigarettes and pods.

26      41.    At the time these representations were made, Defendants concealed from
27  Plaintiff and the FDA, their lack of adequate testing and research and their lack of
28  information about the safety of the JUUL e-cigarettes and pods.

42. Plaintiff, at the time these representations were made by Defendants and at the time Plaintiff purchased and used JUUL e-cigarettes and pods, was ignorant of the falsity of Defendants' representations and believed that the JUUL e-cigarettes and pods were safe and fit for their intended use.

43. In reliance on Defendants' representations, Plaintiff was induced to and did purchase and use JUUL e-cigarettes and pods. Had Plaintiff known of the true facts, then Plaintiff would not have taken such actions.

44. Plaintiff's reliance on Defendants' representations was justified because they reasonably relied upon Defendants' representations concerning the product, having no independent expertise of their own to evaluate the product or the representations to be anything other than what Defendants represented. Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

45. As a proximate cause of Defendants' negligence, Plaintiff must employ clinicians to examine, treat, and care for them, and will incur medical, hospital, pharmaceutical, and incidental and consequential expenses. Plaintiff will continue to incur such medical, hospital, pharmaceutical, and incidental and consequential expenses in the future.

## FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

46. Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

47. During the period of time that Defendants designed, manufactured, distributed, advertised, promoted, supplied and marketed the JUUL e-cigarettes and pods, they knowingly and purposely represented to the Plaintiff, the FDA, and users of JUUL e-cigarettes and pods JUUL e- cigarettes and pods that the products were fit for their intended purposes, would function without defect, and were appropriate for use.

48. Defendants knew that these representations were false when made. The

true facts that Defendants concealed were that the JUUL e-cigarettes and pods are dangerous and may cause long-term adverse health consequences, including injury to the lungs, brain, and cardiovascular systems.

49.     When Defendants made these representations, they knew that the representations were false. The representations were made by Defendants with intent to deceive the public, including teenagers and young adults, users of JUUL e-cigarettes and pods, such as the Plaintiff, and the FDA, with intent to induce them to purchase and use JUUL e-cigarettes and pods.

50.     The teenagers, young adults, and users of JUUL e-cigarettes and pods, including Plaintiff, at the time these representations were made by Defendants and at the time the JUUL e-cigarettes and pods were purchased and used, were ignorant of the falsity of Defendants' representations and believed that the JUUL e- cigarettes and pods were safe for use, safer than traditional cigarettes, not harmful like traditional cigarettes, and were fit for their intended purposes, and that JUUL e-cigarettes and pods were not dangerous and did not impose any health risks, and would function without defect.

51.     Plaintiff's reliance on Defendants' representations was justified because they reasonably relied upon Defendants' representations concerning the product, having no independent expertise of their own to evaluate the product or the representations to be anything other than what Defendants represented. Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

52.     As a proximate cause of Defendants' actions, Plaintiff must employ clinicians to examine, treat, and care for them, and will incur medical, hospital, pharmaceutical, and incidental and consequential expenses. Plaintiff will continue to incur such medical, hospital, pharmaceutical, and incidental and consequential expenses in the future.

## SIXTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY
## (AGAINST ALL DEFENDANTS)

53.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

54.     Defendants designed, manufactured, distributed, packaged, compounded, merchandised, advertised, promoted, supplied and sold JUUL e-cigarettes and pods and, before the JUUL e-cigarettes  and pods were purchased and used, Defendants impliedly warranted to Plaintiff and the FDA that the JUUL e-cigarettes and pods were of merchantable quality and safe for the use for which they were intended.

55.     Plaintiff relied on the skill, judgment, and representations of Defendants in purchasing and using the JUUL e-cigarettes and pods.

56.     The JUUL e-cigarettes and pods were unsafe for their intended use and were not of merchantable quality as warranted by Defendants in that they had dangerous propensities when put to their intended use.

57.     Plaintiff now suffers from the continuing likelihood of medical problems as described herein.

58.     As a proximate cause of Defendants' actions, Plaintiff must employ clinicians to examine, treat, and care for them, and will incur medical, hospital, pharmaceutical, and incidental and consequential expenses. Plaintiff will continue to incur such medical, hospital, pharmaceutical, and incidental and consequential expenses in the future.

## SEVENTH CAUSE OF ACTION: BREACH OF EXPRESS WARRANTY
## (AGAINST ALL DEFENDANTS)

59.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

60.     Defendants designed, manufactured, distributed, packaged, compounded, merchandised, advertised, promoted, supplied and sold JUUL e-cigarettes and pods and, before the JUUL e-cigarettes and pods were purchased and used, Defendants

expressly warranted to Plaintiff that the JUUL e-cigarettes and pods were of merchantable quality and safe for the use for which they were intended.

61.   At the time of making said express warranties, Defendants had knowledge of the purpose for which the JUUL e-cigarettes and pods were to be used and warranted them to be, in all respects, fit, safe, and effective and proper for such purposes.

62.   Plaintiff relied on the skill, judgment and express warranties and representations of Defendants in having the purchasing and using the JUUL e-cigarettes and pods.

63.   These warranties were false and untrue at the time they were made. Defendants knew that the JUUL e-cigarettes and pods were unsafe and unsuited for the use for which they were intended, and that they could cause attendant medical problems as described herein. Further, the JUUL e-cigarettes and pods were unsafe for their intended use and were not of merchantable quality as warranted by defendants in that they had dangerous propensities when put to their intended use.

64.   The JUUL e-cigarettes and pods designed, manufactured, distributed, packaged, compounded, merchandised, advertised, promoted, supplied and/or sold by Defendants, proximately and directly exposed Plaintiff to the harmful health consequences and medical conditions, as set forth herein.

**EIGHTH CAUSE OF ACTION: DECEIT BY CONCEALMENT –**
**CALIFORNIA CIVIL CODE §§ 1709, 1710 (AGAINST ALL DEFENDANTS)**

65.   Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

66.   Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them, from the time that the JUUL e-cigarettes and pods was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived Plaintiff, the public in general, and the FDA, by concealing from them the true facts concerning JUUL e-cigarettes and pods, which

1   Defendants had a duty to disclose.

2       67.     Plaintiff is informed and believes, and thereon alleges, that at all times

3   relevant hereto, Defendants, and each of them, conducted a sales and marketing

4   campaign to promote the sale of JUUL e-cigarettes and pods and willfully deceived

5   Plaintiff, the public in general, and the FDA, as to the health risks and consequences of

6   the use of JUUL e-cigarettes and pods, but not limited to, the following false,

7   deceptive, misleading, and untruthful advertisements, public statements, marketing

8   campaigns, and promotions:

9       a.      In failing to warn Plaintiff of the hazards associated with the use of JUUL

10  e-cigarettes and pods;

11      b.      In failing to properly test JUUL e-cigarettes and pods to determine

12  adequacy and effectiveness or safety measures, if any, prior to releasing JUUL e-

13  cigarettes and pods for consumer use;

14      c.      In failing to advise the FDA and the public about the adverse reports it had

15  received regarding JUUL e-cigarettes and pods;

16      d.      In failing to remove JUUL e-cigarettes and pods from the market and/or

17  issue additional warnings when Defendants knew or should have known JUUL e-

18  cigarettes and pods posed or caused greater health risks than previously stated;

19      e.      In failing to act like a reasonably prudent company under similar

20  circumstances.

21      68.     Defendants, and each of them, were aware of the foregoing, that JUUL e-

22  cigarettes and pods was not safe, fit, or effective for use as intended.  Furthermore,

23  Defendants were aware that the use of JUUL e-cigarettes and pods were hazardous to a

24  user's health, and that JUUL e-cigarettes and pods carries a significant propensity to

25  cause serious injuries to users including, but not limited to, the injuries suffered by

26  Plaintiff as alleged herein.

27      69.     Defendants intentionally concealed and suppressed the true facts

28  concerning JUUL e-cigarettes and pods with the intent to defraud Plaintiff, other

consumers, and the public in general, in that Defendants knew that Plaintiff would not have used JUUL e-cigarettes and pods if they had known the true facts concerning the risks and dangers of JUUL e-cigarettes and pods.

70.     As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiff suffered injuries and damages as alleged hereinabove.

## NINTH CAUSE OF ACTION: CONSTRUCTIVE FRAUD
## (AGAINST ALL DEFENDANTS)

71.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

72.     Plaintiff is informed and believes, and thereon alleges, that Defendants falsely and fraudulently represented to Plaintiff, and members of the general public, that JUUL e-cigarettes and pods were safe for use. The representations by Defendants were in fact false. Contrary to Defendants' representations, JUUL e-cigarettes and pods were not safe for use by members of the general public and were, in fact, extremely dangerous to consumers.

73.     Defendants made other representations about the safety of JUUL e-cigarettes and pods, including, but not limited to, the false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions alleged herein.

74.     Defendants misrepresented the safety of JUUL e-cigarettes and pods, represented that JUUL e-cigarettes and pods were safe for use, and concealed warnings of the known or knowable risks and side effects of JUUL e-cigarettes and pods.

75.     When Defendants made these representations, they knew that such representations were false. Defendants made the representations with the intent to defraud and deceive Plaintiff, consumers, and the public in general, and with the intent to induce them to use JUUL e-cigarettes and pods in the manner alleged in this

Complaint.

76.    Plaintiff took the actions alleged in this Complaint, while ignorant of the falsity of Defendants' representations, and reasonably believed them to be true. In reliance upon such representations, Plaintiff was induced to, and did, use JUUL e-cigarettes and pods as alleged in this Complaint. If Plaintiff had known the actual facts, Plaintiff would not have used JUUL e-cigarettes and pods, and their reliance upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

77.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff sustained the injuries and damages as alleged in this Complaint.

## PUNITIVE DAMAGES ALLEGATION

78.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

79.    Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of JUUL e-cigarettes and pods, including Plaintiff. Defendants' conduct, as described herein, knowing the dangers and risks of JUUL e-cigarettes and pods, yet concealing and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' evil motive or a reckless indifference to the safety of users of JUUL e-cigarettes and pods, including Plaintiff.

80.    Plaintiff is entitled to punitive damages because Defendants' failure to warn and other actions as described herein were malicious, wanton, willful or oppressive or were done with reckless indifference to the Plaintiff and the public's safety and welfare.  Defendants misled both the FDA and the public at large, including the Plaintiff herein, by making false representations about the safety of their product. Defendants downplayed, understated and/or disregarded their knowledge of the serious

and permanent side effects associated with the use of their product, despite available information demonstrating that JUUL e-cigarettes and pods were likely to cause serious side effects.

81. Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects. Nonetheless, they continued to market the products by providing false and misleading information with regard to safety and efficacy.

82. Defendants' actions described above were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

83. As a direct and proximate result of the willful, wanton, evilly, motivated and/or reckless conduct of Defendants, Plaintiff sustained damages as set forth above. Accordingly, Plaintiff seeks and is entitled to punitive damages in an amount to be determined at trial.

**TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

84. Defendants failed to disclose a known defect and affirmatively misrepresented that JUUL e-cigarettes and pods were safe for their intended use. Further, Defendants actively concealed the true risks associated with the use of JUUL e-cigarettes and pods. Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of Defendants' concealment of and misrepresentations regarding the true risks associated with JUUL e-cigarettes and pods, Plaintiff could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

85. Thus, because Defendants fraudulently concealed the defective nature of JUUL e-cigarettes and pods and the risks associated with their use, the running of any statute of limitations has been tolled.

86. Additionally, and alternatively, Plaintiff files this lawsuit within the applicable limitations period of first suspecting that JUUL e-cigarettes and pods caused the appreciable harm sustained by Plaintiff. Plaintiff did not have actual or constructive

knowledge of the existence of all facts or causes of action indicating to a reasonable person that Plaintiff was the victim of a tort.  Plaintiff was unaware of the facts upon which a cause of action rests until less than the applicable limitations period prior to the filing of this action. Plaintiff's lack of knowledge was not willful, negligent, or unreasonable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above- referenced claims and Causes of Action and as follows:

1.     Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.     Past and future economic and special damages according to proof at the time of trial;

3.     Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.     Medical expenses, past and future, according to proof at the time of trial;

5.     Punitive or exemplary damages according to proof at the time of trial;

6.     Attorney's fees;

7.     For costs of suit incurred herein;

8.     For pre-judgment interest as provided by law; and

9.     For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DATED: October 14, 2019

**PANISH SHEA & BOYLE LLP**

By: _____

Brian J. Panish

**SCHLESINGER LAW OFFICES, P.A.**
Scott Schlesinger
Jonathan Gdanski
Jeffrey Haberman

Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

DATED: October 14, 2019

**PANISH SHEA & BOYLE LLP**

By: _____

Brian J. Panish

**SCHLESINGER LAW OFFICES, P.A.**
Scott Schlesinger
Jonathan Gdanski
Jeffrey Haberman

Attorneys for Plaintiff